**IT IS ORDERED as set forth below:**



**Date: August 14, 2020**

_____
**Wendy L. Hagenau
U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. 19-54798-WLH |
| SANAM CONYERS LODGING, LLC, | CHAPTER 11 |
| Debtor. | JOINTLY ADMINISTERED |

**ORDER CONFIRMING DEBTOR JANAM MADISON LODGING, LLC'S
AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

    **THIS MATTER** is before the Court on the Debtor, Janam Madison Lodging, LLC,'s First Amended Plan of Reorganization filed May 11, 2020. For the reasons stated below, the Court finds the plan complies with 11 U.S.C. § 1129 and confirmation is appropriate.

1

## I. FACTS

### a. Background

The Debtor is a small business debtor that operates a 56-room Red Roof Inn and Suites hotel in Madison, Georgia (the "Property"). The Debtor was formed in 2015 and is owned by Sunita Patel (80%) and Galaxy Management, LLC (20%) ("Galaxy"), which is wholly owned by Sunita Patel. Sunita Patel and Galaxy managed the Debtor pre-petition.

The Debtor purchased the hotel in February 2016 for $1,850,000. Sunita Patel contributed approximately $300,000 towards the purchase and the Debtor financed the balance with loans from NOA Bank and the U.S. Small Business Administration ("SBA"). The note held by NOA Bank was later assigned to GRP Capital, LLC and Drs. Kiran & Pallavi Patel 2017 Foundation for Global Understanding, Inc. (the "Patel Group") in late 2018 (the "Patel Note").

In 2017, the hotel switched flags from EconoLodge to a Red Roof Inn and Suites franchise. In January 2019, a fire caused extensive damage to the hotel and the hotel closed from the middle of January 2019 through April 2019. When the hotel reopened, a number of rooms remained closed due to the fire damage.

### b. Bankruptcy

The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on March 26, 2019.[1] The history of this case is described in detail in the Debtor's Amended Disclosure Statement (Doc. No. 552) and incorporated herein.

---

[1] Debtor is one of seven related companies with common ownership that filed for bankruptcy relief on the same day. The Debtor's case, 19-54790-WLH, is being jointly administered in the above-captioned case number 19-54789-WLH pursuant to the Court's Order Directing Joint Administration entered on April 29, 2019 (Doc. No. 30).

The Patel Group filed a claim for $1,058,578.15 including principal, interest, late fees, and attorney's fees (Claim No. 23). Debtor objected to the claim, contending, inter alia, the Patel Group was not entitled to recover the default rate of interest and late fees (Doc. No. 551).

The Debtor sought to extend the deadline to file and confirm a plan under Sections 1129(e) and 1121(e) to February 27, 2020. The Patel Group objected to the request, but the parties ultimately reached an agreement and the Court extended the deadline for the Debtor to file a plan of reorganization through February 27, 2020 (Doc. No. 406). Debtor filed a disclosure statement (Doc. No. 448) and Chapter 11 plan of reorganization (Doc. No. 449) on February 25, 2020. The Court conditionally approved the disclosure statement and set a final hearing on the disclosure statement and confirmation of the Debtor's plan for April 2, 2020 (Doc. No. 457).

Shortly after the Debtor filed its disclosure statement and plan of reorganization, the COVID-19 pandemic hit. The Debtor sought to continue the hearing on confirmation and to extend the time to confirm the plan to verify its income projections in light of the pandemic. (Doc. No. 505). The Court held a telephonic hearing on April 2, 2020 and continued the hearing to May 12, 2020 (Doc. No. 526).

Debtor filed an amended disclosure statement (Doc. No. 552) and Amended Chapter 11 Plan of Reorganization (Doc. No. 553) (the "Amended Plan") on May 11, 2020. The Court held a hearing on May 12, 2020, after which it conditionally approved the Debtor's amended disclosure statement, set June 17, 2020 as the deadline to change a prior ballot or to cast a new ballot for the Amended Plan, and scheduled a final hearing on the amended disclosure statement and confirmation of the Amended Plan for June 25, 2020. (Doc. No. 564.)

Ascentium, which loaned money for furniture and equipment, filed objections to confirmation (Docs. No. 589 and 595) objecting to Debtor's proposed treatment of Ascentium's

3

claim for three reasons: 1) the Amended Plan did not include a mutually agreeable form of deed to secure debt in favor of Ascentium; 2) the Amended Plan did not provide a deadline for Debtor to execute and deliver the deed to secure debt to Ascentium; and 3) the Amended Plan inserted a codebtor stay.  Ascentium also filed ballots rejecting the Plan (Docs. Nos. 494 and 495).

The Patel Group filed an objection to the Amended Plan (Doc. No. 585), in which it contended, inter alia, the Amended Plan was not feasible and the Debtor's twelve-month projected budget attached to the Amended Disclosure Statement did not demonstrate the Debtor could make the payments required by the Amended Plan with reasonable probability.  In particular, the Patel Group argued the payments due on the Effective Date exceeded Debtor's cash on hand, the Debtor's budget did not address property improvements presumably required under the Red Roof Inn franchise agreement, and the Debtor had failed to demonstrate it could pay Ascentium in full in month 49 and the Patel Group in month 61 as proposed.  The Patel Group also questioned the ability of Sunita Patel to manage the Debtor.

The City of Madison, a Class A claimant, voted in favor of the Amended Plan (Doc. No. 588), and three general unsecured creditors treated in Classes F and G filed ballots in favor of the Amended Plan (Docs. Nos. 581, 587, 593).  Debtor filed a ballot certification (Doc. No. 598), stating a class of claims impaired under the Plan had accepted the Amended Plan but the Amended Plan had not received the requisite acceptances to be confirmed under Section 1129(a)(8) of the Bankruptcy Code.

The Court held an evidentiary hearing on July 27 and 28, 2020 on confirmation of the Amended Plan and the Debtor's objection to the claim filed by the Patel Group.  Counsel for the Debtor (Edward Danowitz) and counsel for the Patel Group (Ian Falcone) appeared in person, and

counsel for the United States Trustee (David Weidenbaum), Ascentium (Kevin Stine), and Red Roof Inn (Gus Kalergus) appeared by phone.

Counsel for Ascentium and the Debtor conferred prior to the final hearing on confirmation and announced they had an agreement to resolve Ascentium's objection to confirmation. A stipulation was filed at Doc. No. 631 and is incorporated herein. With the amendments provided, Ascentium recast its ballot to accept Debtor's Amended Plan in Class E.

Counsel for the Patel Group and the Debtor also conferred prior to the final hearing and resolved the Debtor's objection to the Patel Group's claim. The parties stipulated the Patel Group holds an allowed secured claim in the amount of $990,797.94, including principal, interest, attorney's fees, and costs through July 31, 2020. The parties thereafter filed a consent order resolving the claim objection (Doc. No. 633).

The Court heard testimony from Sunita Patel, Brandon Snuffer, and Manoj "Mike" Patel, who was qualified as an expert in the acquisition and development of hotels including financing and valuation for such purposes. After considering all the evidence and arguments presented, the Court held a telephonic hearing on July 30, 2020 during which it announced its oral findings of fact and conclusions of the law, which are incorporated herein.

    c. **<u>Plan Provisions</u>**

The Amended Plan contemplates the Debtor will retain the hotel and Sunita Patel, with the assistance of Brandon Snuffer, will manage it. The Debtor intends to pay all claims over time. The Amended Plan provides on the Effective Date, Debtor must pay administrative expenses, the cure cost to Red Roof Inn, and the administrative convenience class. The Debtor will make payments over 24 months to the Internal Revenue Service, Georgia Department of Revenue, and the City of Madison. The monthly payment according to the evidence is $1,887.43. The Amended

Plan, as orally amended at the hearing, requires monthly payments to the Patel Group in the amount of $6676.43 for 60 months, and payment in full in month 61. The Debtor will pay the SBA's claim in the amount of $618,094.61 at a rate of $2,714 a month. The SBA debt is due in full on its original maturity date of May 1, 2036. The Amended Plan proposes to pay the claim of Ascentium in the amount of $223,164.45 by paying interest only in the amount of $976.45 a month for 48 months and paying the principal due in month 49. Finally, the Amended Plan proposes to pay general unsecured creditors in Class G from a pool of $4000 a quarter for the first two years (until priority tax claims are paid) and then from a pool of $8000 a quarter until paid in full. Total general unsecured claims in this class are approximately $150,000.

## II.     PLAN CONFIRMATION STANDARD

The requirements for confirmation are set forth in 11 U.S.C. § 1129. The Court finds the Debtor's Amended Plan complies with the provisions as follows.

Section 1129(a)(1) is satisfied because the Amended Plan complies with the applicable provisions of the Bankruptcy Code.

Section 1129(a)(2) is met as the Debtor has complied with the Bankruptcy Code.

Section 1129(a)(3) is satisfied because the Amended Plan was proposed in good faith and not by any means forbidden by law.

Section 1129(a)(4) is met because the Amended Plan requires approval of attorney fees before disbursement.

Section 1129(a)(5) is met because the Amended Plan discloses the Debtor will be managed by Sunita Patel, the 80% individual owner of the Debtor and the 100% owner of the company (Galaxy) that owns the remaining 20% of the Debtor. Ms. Patel will not receive compensation until unsecured creditors are paid. While the Patel Group raised questions about Ms. Sunita Patel's

ability to manage the Debtor, the Court found her to be credible and to fully understand the operations of the hotel. She has adequately explained why she was unable to manage the Property at the beginning of the case and to handle the many financial reports required in bankruptcy, and she has satisfied the Court that, with Mr. Snuffer's assistance, she can adequately manage the Debtor.

Section 1129(a)(6) is inapplicable.

Section 1129(a)(7) is met as the creditors will receive under the Amended Plan what they would receive in a Chapter 7 liquidation. Upon liquidation of the Debtor's sole asset, the hotel, the current value of the Property is sufficient to pay the Patel Group but not sufficient to pay the secured SBA claim or secured Ascentium claim in full. The unsecured creditors would receive no distribution.

With respect to Section 1129(a)(8), Classes A and B are unimpaired, and three impaired classes (Classes E, F, and G) have accepted the Amended Plan. Class C (the Patel Group) has rejected the Amended Plan and objected to it. Class D (the SBA) did not vote or file an objection and took no position on whether the Amended Plan should be confirmed.

All priority tax claims will be paid within 24 months of confirmation, which is within 60 months of the petition date satisfying Section 1129(a)(9).

Section 1129(a)(10) is met because three impaired classes have accepted the Amended Plan.

Section 1129(a)(12) is satisfied as United States Trustee fees are current, and any outstanding fees will be paid on the Effective Date.

Sections 1129(a)(13), (14), (15), and (16) are not applicable.

Section 1129(b) allows a plan to be confirmed even if all classes have not accepted the plan under 1129(a)(8), provided the plan is fair and equitable. With respect to secured claims (both Classes C and D), fair and equitable means the holder of the claim retains its lien in the assets securing its allowed claim (to the extent of its allowed claim) and the holder receives deferred cash payments totaling at least the value of the collateral securing its allowed claims, or the allowed amount of its claims if there is sufficient collateral. 11 U.S.C. 1129(b)(2)(A). The proposed treatment of the Patel Group's claim in Class C and the SBA's claim in Class D satisfies these criteria. The secured creditors are retaining their liens in the allowed amounts of their claims and their claims are to be paid in full, with interest at a fair rate, which neither party contested.

### III.    FEASIBILITY STANDARD

The remaining issue for confirmation is whether the Debtor's Amended Plan satisfies Section 1129(a)(11), which relates to feasibility. Section 1129(a)(11) requires that the court find confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

The parties agree on the legal standard. Section 1129(a)(11) requires courts to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable. A plan does not have to be a guaranty of success. See In re Haas, 162 F.3d 1087, 1090 (11th Cir. 1998) ("The Plan itself must offer a reasonable prospect of success and be workable."); see also In re American Capital Equip., LLC, 688 F.3d 145, 156 (3d Cir. 2012) ("Although § 1129(a)(11) does not require a plan's success to be guaranteed, . . . the plan must nevertheless propose 'a realistic and workable framework[.]' ").

8

The use of the word "likely" in Section 1129(a)(11) requires the Court to assess whether the plan offers a reasonable "probability of success, rather than a mere possibility." In re Aspen Vill. at Lost Mountain Memory Care, LLC, 609 B.R. 536, 544 (Bankr. N.D. Ga. 2019). Establishing feasibility requires more than a promise, hope, or unsubstantiated prospect of success, and a determination of feasibility must be "firmly rooted in predictions based on objective fact." Id. (citing In re Diplomat Constr., Inc., 2009 WL 6498180 at *2 (Bankr. N.D. Ga. 2009) (Diehl, J.)). The debtor bears the burden of establishing feasibility by a preponderance of the evidence. Fin. Sec. Assurance v. T-H New Orleans Ltd. Pshp. (In re T-H New Orleans Ltd. Pshp.), 116 F.3d 790, 801 (5th Cir. 1997); Aspen Vill. at Lost Mountain Memory Care, LLC, 609 B.R. at 543.

## IV. FEASIBILITY ANALYSIS

The Amended Plan provides the Debtor must pay administrative expenses, the cure cost to Red Roof Inn, and the administrative convenience class on the Effective Date. Evidence showed the amount needed on the Effective Date was $30,239, and the Debtor had over $50,000 in its account at the time of the hearing. It is therefore reasonably probable the Debtor can make the payments due.

As to future payments, we are in the unique situation of considering the feasibility of the reorganization of a hotel in the middle of a global pandemic, which is a once in a century occurrence. There is little case law on how to factor the pandemic into the analysis. The Court found one case in which the Bankruptcy Court for the District of Puerto Rico considered feasibility while confirming a plan during the pandemic. In In re Velazquez, 2020 Bankr. LEXIS 1387 (Bankr. D.P.R. May 27, 2020), the court observed that while the debtors were not completely unscathed by the COVID-19 pandemic and local lockdown, the debtors' plan nevertheless offered a reasonable assurance of success and was feasible.

9

At this point, there is no consensus of scientific or political leaders as to when it is "reasonably probable" the pandemic will subside, and life will return to "pre pandemic normal." At the same time, that cannot spell the end of attempts to reorganize during a pandemic. The Bankruptcy Code is meant to provide an opportunity for businesses to reorganize due to unforeseen circumstances, among others, and during this pandemic it is especially important that debtors be given the opportunity to reorganize if they can find ways to adapt to our current circumstances. Normally, a plan which provides a payout over a five-year period such as proposed by the Debtor can present issues of how to foresee feasibility years in advance. But here, it is actually to the Debtor's benefit. While we do not know exactly when the pandemic will abate, most experts, including the Patel Group's own experts, believe it will abate at some point in 2021.

To determine if the monthly payments to creditors are feasible, the court must find that the revenue and expense projections are "reasonably probable." The Debtor projects total Year 1 revenue of $662,788, or approximately $55,000 a month. (Debtor's Exhibit 1, Doc. No. 613 Ex. 2 p. 38.) Mr. Snuffer testified he based his projections on the Debtor's revenue by month in prior years. The Patel Group argues the revenue projections are unreasonable given the current pandemic and the Debtor's history. The history of performance is challenging to apply because the Debtor changed to Red Roof Inn in 2017 and began a several-hundred-thousand-dollar upgrade of the Property. Then, as the Debtor was hitting its stride, it suffered a fire and was shut down for the period January through April 2019. This bankruptcy case was filed in March 2019 and then, in March 2020, the pandemic hit.

Despite these challenges, the Debtor's 2019 profit and loss statement shows revenue of $478,327. (Patel Group Ex. 12B, Doc. No. 616 Ex. 33.) This total divided by 8, for the 8 months the Debtor operated in 2019, reflects monthly revenue of approximately $60,000, which

annualized is $717,000.  This is really the only "normal" period the Debtor has had recently, and the projected revenue is $50,000 less.  The operating reports for the last 12 months show cash receipts of $611,000, which includes a $10,000 loan.  Removing the loan, cash receipts for the last 12 months total approximately $600,000.  (Patel Group Ex. 3, Doc. No. 616 Exs. 4-18.)  CBRE prepared an appraisal in which it assumes Year 1 revenue is $564,000.  (Patel Group Ex. 5, Doc. No. 616 Ex. 20.)  Evidence supporting revenue projections in Year 1 ranges from a low of $564,0000 in CBRE's appraisal to $717,000, the Debtor's 2019 performance.  The Debtor's projections are within that range and supported by actual performance during 2019.

The Court notes CBRE assumes the Debtor will have a 60% occupancy rate for the year.  The STAR report for the Running 28 days ending June 2, 2020 shows occupancy at 59.6% (Debtor's Ex. 5, Doc. No. 613 Ex. 6 at 3), and for the period ending July 11, occupancy of 58.2%.  (Debtor's Ex. 6, Doc. No. 613 Ex. 7 at 3.)  The Debtor has projected an annual occupancy of 62%, so that assumption is not far from the appraiser's assumption and the Debtor's current pandemic performance.  The appraiser assumes an average daily rate of $46, even though the average daily rate ("ADR") for the trailing 12 months is $46.50.  The STAR report for June 2, 2020 shows an ADR of 42.43 and for July 11 of $44.27 (Debtor's Ex. 5, Doc. No. 613 Ex. 6 at 3), and the Debtor assumes an ADR of $51.  This amount is $5-7 a day higher than current pandemic performance.

Much of the likelihood of hitting the revenue projections depends on the pandemic and the Debtor's ability to pivot to other sources of customers.  In Georgia, the Governor is in favor of economic opportunities during the pandemic and has resisted any calls to "shut down" businesses.  See e.g., State of Georgia Executive Order 07.31.2020 "Providing additional guidance for Empowering a Healthy Georgia in response to COVID-19."  All of the universities in Georgia are returning to campus in some fashion, and the Debtor is located near Athens, Georgia where the

11

University of Georgia ("UGA") is located.  Much was made of whether UGA would play football and, if so, whether fans would attend.  But as Mr. Snuffer pointed out, even without football, the Debtor tends to benefit when the University is in session at all due to the shortage of rooms in Athens.  Moreover, the evidence was that schools in Morgan County, where the hotel is located, are returning to school in-person in a couple of weeks, unlike schools in Metro Atlanta.  Although the COVID pandemic has hit the entire country, it is to the Debtor's benefit that it is located in a rural part of the state where business restrictions and mobility restrictions are less than in metro Atlanta.

There was also much discussion about whether the Masters Golf Tournament would be played as scheduled in November of this year and April 2021 and, if so, whether the hotel would see the usual uptick in business.  No one knows for sure, but the Court notes golf tournaments are taking place and the decision about admission of fans is being made at the time of the tournament.  The Debtor is not just banking on the Masters tournament being held or football resuming.  The Debtor has in the meantime marketed itself as a longer stay facility to corporations, particularly contractors doing construction work in the area.  While the rate obtained from these guests may not be the same as the one that would be offered to the UGA or Masters' crowd, it is to the Debtor's credit that it found alternative ways to make revenue.

Finally, the Court notes that CBRE projected in its report from July 16 stabilization from COVID would occur in the third quarter of 2020 with recovery in the fourth quarter and stronger growth in 2021 (Patel Group Ex. 5, Doc. No. 616 Ex. 20 p. 25.)  It goes on to say "our forecasts suggest that while the impact [of COVID] will be severe, it is expected to be short lived.  In our most likely forecast scenario, the hotel sector is expected to rebound sharply beginning in the second half of the year." Id. at p. 46.  This supports the Debtor's projections under the Amended

12

Plan, which run from June 2020 to May 2021 and encompass this period of rebound described by CBRE. Considering all the evidence, the Court concludes the Debtor's revenue projections in Year 1 are reasonably probable.

Turning to expenses, the evidence demonstrated the Debtor's expense projections were incorrect in several respects. The Debtor underestimated the monthly payment to the Patel Group by $480.43 a month, and it underestimated the payment to tax authorities by $213 a month. This adjustment increased expenses by $8,321.16 a year. The evidence also showed the Debtor had budgeted an expense for an outside payroll service in the amount of $23,493 a year, which it was eliminating at the end of June and substituting a payment of $1,000 month to Mr. Snuffer. This change saves the Debtor $11,493.00 a year. The net of these changes is to *increase* the Debtor's net income by $3,171.84 for a total income of $44,758.84 in Year 1. The Court finds it reasonably probable the Debtor can make all payments due in Year 1.

The Debtor only prepared a budget for Year 1 and assumed it would be able to perform at least as well in subsequent years. CBRE assumed the Debtor's revenue, expenses, and net income would increase every year over the operable five-year period, and the Patel Group's expert assumed the same. The Patel Group challenged the Debtor's anticipated expenses, pointing out the Debtor had not planned to reserve for capital expenditures and any upgrades required by Red Roof Inn. Certainly, it is wise to plan for unanticipated expenses. The Patel Group's experts, however, assume an increase in net income each year that would provide a cushion for the Debtor, and the Debtor expects to do better in future years even though it planned for no increase in income. Additionally, no evidence was presented as to any specific items that needed to be planned for or replaced, and counsel for Red Roof Inn stated the Debtor was in compliance with all Red Roof Inn

13

requirements. The Court finds the Debtor's projection of expenses to be reasonable and concludes it is reasonably probable the Debtor can make all the monthly payments required under the plan.

    a. **Ascentium**

The Amended Plan requires payment in full to Ascentium of $223,164 in month 49. Much of the hearing was based on whether the Debtor would have money from operations to pay the debt timely and, if not, whether the Debtor could refinance the debt of Ascentium, the Patel Group, and SBA in month 49.

As discussed above, the Debtor's adjusted expenses leads to net income in Year 1 of $44,758.84.

In Year 2, the Debtor will save an additional $12,000 because it will have completed its payments to its bankruptcy counsel, Mr. Danowitz, at the end of that year. Adding that $12,000 to the net income leads to Year 2 income of $56,758.84.

In Year 3, the Debtor will have completed its payments to the taxing authorities and the quarterly amount it will need to pay unsecured creditors will go from $4000 a quarter to $8000 a quarter. The satisfaction of the taxing authorities reduces the debtor's expenses by $22,644 a year. The increase in payment to general unsecured creditors increases the Debtor's expenses by $16,000, so the Debtor will see its net income increase by $6,644. Adding that to the Year 2 income leads to net income in Year 3 of $63,402.84.

In Year 4, no changes are planned to payments, so the income at the end of Year 4 is also $63,402.84.

In total, the Debtor is expected to have net income of $228, 323.36 at the end of Year 4. This amount is sufficient to pay Ascentium in full in cash in month 49 as required by the Amended Plan. And this assumes *no* increase in revenue or net income from operations for five years. It is

a conservative projection for the future, and the Court concludes it is reasonably probable the Debtor can pay Ascentium in accordance with the Amended Plan without needing to refinance the Property in month 48.

### b. Patel Group

Next, the debt of the Patel Group must be paid at the end of five years. The evidence showed that the principal balance on the debt in month 60 will be $830,528.88. (Debtor's Exhibit 10, as amended.) The report of CBRE estimates the current value of the Property to be $1,450,000. (Patel Group Ex. 5, Doc. No. 616 Ex. 20.) Mr. Manoj Patel, the lender's expert, assumed the value of the Property at the end of Year 5 would be $1,620,000. The Debtor believes the Property is worth more now based on a tax assessment of $2,300,000 and the original purchase price of $1,850,000. Mr. Patel opined that the Debtor would likely have to refinance both the Patel loan and the SBA loan, even though the SBA loan is not due until 2036, because it was unlikely the Debtor could get the SBA consent necessary to refinance just the first loan.

The Debtor assumed it could get financing at an 85% loan to value ratio, which is what the SBA provided when the Debtor originally purchased the Property. Mr. Sandoval, the attorney for the SBA, pointed the Court to regulations limiting, if not prohibiting, the SBA from lending to an entity that has previously defaulted, 13 CFR 120.110, thus calling into question whether an SBA loan would be available in five years to refinance the debt at an 85% ratio. Mr. Patel opined that, without SBA support, a traditional lender would likely require a 70% loan to value ratio and a hard money lender may require a 50% loan to value ratio. The amortized balance of the SBA loan at the end of Year 5 is $521,245.57. (Debtor's Exhibit 12, as amended.)

In order to pay the Patel Loan at the end of Year 5, the Debtor has three options: refinance just the first loan (the Patel Group's loan), refinance the first and second loan (both the Patel Group

15

and the SBA's loans), or sell the Property. Any of the options will satisfy the Debtor's obligation to the Patel Group. The Court notes that the Patel Note was transferred to the Patel Group shortly before this case was filed, so obviously it is possible for the Patel Note to be purchased by payment in full to the Patel Group if the purchaser is agreeable to restructuring it in agreement with the Debtor.

The Third-Party Loan Agreement with the SBA contemplates the possibility of a sale of a note, with the SBA having a right of first refusal. The loan to value ratio of the first at the end of five years is 53%, an attractive position for the right purchaser. If the Debtor needed to refinance the first and second loans, the loan to value ratio is only 83%, assuming a value of $1,620,000, and the Debtor would struggle to find a non-SBA lender to loan at that ratio. However, the lender's projected value of the Property of $1,620,000 is more than enough to pay the total debt of $1,351,774.45.

The Court concludes it is reasonably probable the Debtor could either find a purchaser of the Patel Note or sell the Property and pay the Patel Group in full. The Court notes the Patel Group will be more than adequately protected throughout the Amended Plan term by the value of the Property based on the estimates of their own experts.

### c. SBA Loan

It is also reasonably probable the SBA loan can be paid in full in 2036. As discussed above, it is reasonably probable the Debtor can make each monthly payment. It is also reasonably probable the value of the Property at the end of Year 5 is sufficient to pay the SBA debt in full if the Debtor needs to sell the Property in order to pay the Patel Group. Otherwise, the Debtor will continue to pay the monthly amount due until 2036 (the original maturity date), at which time the balloon payment of approximately $270,000 can be paid, assuming the value of the Property does

not dip below $1,620,000, which is a reasonable assumption based on the Patel Group's expert testimony. At this point, the debt on the Property would be the amount used to take out the Patel Group (approximately $830,000) and the SBA debt of $270,000, which, with a value of $1,620,000, is less than a 70% loan to value ratio.

### d. General Unsecured Creditors

The Court has already concluded it is reasonably probable the Debtor can make the monthly payments to general unsecured creditors. After Ascentium is paid at the end of Year 4, the monthly payment to Ascentium drops from the expenses, thus increasing the likelihood that payments will be made. At the end of Year 5, when the Patel Group must be paid, the General Unsecured Creditors will still be owed about $24,000. If the Property is sold, the value is sufficient to pay the Patel Group, the SBA, and the balance to the general unsecured creditors. If the Property is refinanced, it remains reasonably probable the Debtor can pay the last $24,000 in the first 3 quarters of the sixth year.

### V. CONCLUSION

The court recognizes that feasibility is not a crystal ball, and nothing is certain. After evaluating each element of the Debtor's case, including the Debtor's expected revenue, anticipated expenses, required Amended Plan payments, and the appreciation in value of the Property, the Court concludes it is reasonably probable the Debtor can fully perform its Amended Plan. Accordingly, the Court finds the Amended Plan is feasible.

After review and consideration, the Court finds all the requirements for confirmation set forth in Section 1129 have been satisfied with respect to the Amended Plan and confirmation is appropriate. Accordingly,

**IT IS ORDERED** that the Amended Plan is **CONFIRMED** in accordance with 11 U.S.C. § 1129.

**IT IS FURTHER ORDERED**, pursuant to the stipulation with Ascentium filed at Doc. No. 631, the deed to secure debt that Debtor proposes to grant to Ascentium in Class E of the Amended Plan shall be in the form attached to Doc. No. 631. Debtor shall execute and deliver the aforementioned deed to secure debt to Ascentium within 14 days after entry of a final, non-appealable order confirming Debtor's Amended Plan. Section 8.5 of the Amended Plan (titled "Co-Debtor Stay") shall be stricken from the Amended Plan, and no co-debtor stay shall be imposed upon any creditor under the Amended Plan, the order confirming the Amended Plan, or otherwise.

**IT IS FURTHER ORDERED** that any objections to confirmation or any other responses with respect to confirmation of the Amended Plan not previously resolved, resolved herein, or withdrawn are hereby overruled as set forth herein and on the record of the Confirmation Hearing.

**IT IS FURTHER ORDERED** pursuant to section 1141(a) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Amended Plan and this Order bind the Debtor, any holder of a claim against, or interest in, the Debtor whether or not the claim or interest of such holder is impaired under the Amended Plan and whether or not such holder has accepted the Amended Plan, and shall be binding on and inure to the benefit of their respective heirs, executors, administrators, successors and/or assigns.

**IT IS FURTHER ORDERED** that the terms and provisions of the Amended Plan, the stipulation between the Debtor and Ascentium, and the consent order on the Patel Group claim, are incorporated herein and made a part of this Order. The failure specifically to include or reference any particular provision of the Amended Plan in this Order shall not affect, diminish, or

impair the effectiveness of such provision, it being the intent of the Bankruptcy Court that entry of this Order constitutes approval and confirmation of the Amended Plan in its entirety.

**END OF DOCUMENT**